IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| FARUK IBRAHIM, #164878 | * | |
|     Plaintiff | | |
|     v. | * | CIVIL ACTION NO. PJM-08-492 |
| WARDEN NANCY L. ROUSE | * | |
| CASE MANAGER SUPERVISOR O. BRAKE | * | |
| SECRETARY OF D.P.S.C.S. GARY MAYNARD | * | |
| COMMISSIONER OF CORRECTIONS J. MICHAEL STOUFFER | * | |
| ASST. COMMISSIONER OF CORRECTION PAUL O'FLAHERTY | * | |
| WARDEN JOHN ROWLEY PH.D. JAMES K. HOLWAGER | * | |
| ASST. WARDEN RICHARD GRAHAM, JR. SOCIAL WORKER MRS. ROZAS | * | |
| CASE MANAGEMENT SUPERVISOR CASEY CAMPBELL | * | |
| CASE MANAGER SPECIALIST DUNST | | |
|     Defendants | * | |
| | *** | |

MEMORANDUM OPINION

Pending are Defendants' Supplemental Motion to Dismiss or for Summary Judgment and Plaintiff's self-represented opposition.[1] ECF Nos. 35 & 38. The case is ripe for dispositive review.[2] Upon review of papers and exhibits filed, the Court finds an oral hearing in this matter unnecessary. *See* Local Rule 105.6 (D. Md. 2010).

---

[1] Plaintiff's opposition is entitled "Motion to Deny Defendant's Supplemental Response to Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment." ECF No. 38. The Motion to Deny shall be denied; the Motion, however, shall be considered as additional opposition to Defendants' dispositive motion.

[2] Defendants' original Motion to Dismiss or for Summary Judgment and Plaintiff's Cross-Motion for Summary Judgment were denied without prejudice on March 3, 2009. The case was stayed at that time pending the proceedings in *Cabana v. Warden, et al.*, Civil Action No. JFM-07-2205 (D. Md.). ECF No. 24. On April 6, 2010, the stay was lifted, counsel was ordered to supplement the existing record, and the parties were granted additional time to file supplemental responsive pleadings. ECF No. 26. The Court has considered all responsive pleadings in issuing this opinion.

**Background**

At the time he instituted this case, Plaintiff was a Division of Correction ("DOC") inmate alleging that on July 18, 2007, he was removed from general population at the Maryland Correctional Institution at Hagerstown ("MCIH") and placed on administrative segregation.[3] He claims he was served with a notice, but was not given an opportunity to be heard. Plaintiff asserts that after filing a number of complaints regarding his administrative segregation placement, he was transferred, on July 30, 2007, to the Special Management Unit ("SMU") of the North Branch Correctional Institution ("NBCI") without prior notice and without a chance to contest the allegations used to place him on the SMU. ECF No. 1.

Plaintiff complains that his transfer was "punitive." He claims that as of the filing date of his Complaint, he had not been given a written factual basis for his placement on the SMU, but had only been provided vague explanations for the assignment related to behavior, security, and confidentiality. Added to these initial due process claims is Plaintiff's assertion that the conditions of SMU were "atypical" as his assignment was tantamount to indefinite placement on solitary confinement and includes the confiscation of property and the revocation of privileges, with the exception of one-hour of "fresh air" per week while in full restraints and twice weekly showers, which could be revoked for talking to other inmates.[4] Plaintiff also complains that he was subjected

---

[3] Plaintiff currently is held at the York County Prison in York, Pennsylvania. ECF No. 39.

[4] The conditions under which Plaintiff was confined in the SMU included 24-hour cell restriction with only one hour for recreation each week, during which Plaintiff was offered an opportunity to go to an outdoor recreation cage restrained with leg irons, handcuffs, a security box, and a waist chain. ECF No. 1. He contends that his privileges could be curtailed for not participating in the SMU programs, for talking to other inmates, or for "fishing a kite" (passing a written message to other prisoners by attaching a string to it). He further contends that he was not permitted commissary privileges, nor permitted to possess certain religious articles or participate in congregate prayer. Plaintiff also states he was subjected to "cheese" meals several times a week, even though he does not eat cheese. *Id.*

to a Behavioral Management Program ("BMP") while on SMU which allows for inmates to achieve one of six "levels," subject to the "whims and mercy" of SMU officers and the levels committee. He claims that after the filing his initial complaint he was maintained on the intake level due to his refusal to voluntarily participate in the program, despite having received no infractions. Plaintiff further complains that Division of Correction directives ("DCD") permitted his placement in such conditions for being "directly involved or associated with violent behavior." He complains that these directives are overly broad and have no criteria, process, or description as to who will fall into the category.[5] ECF No. 1.

Plaintiff further raises Fourteenth and Eighth Amendment equal protection and deliberate indifference claims, stating that he was treated differently than other inmates classified to administrative segregation and that the conditions of his SMU cell assignment subjected him to cruel and unusual punishment.[6] In addition, he claims his forced participation in the BMP violated his First Amendment rights as the program sought to "change the way [he] thinks and believes through psychological approaches and solitary conditions." ECF No. 1. He stated that as he did not want to accept the psychological treatment, he remained in solitary confinement without regard to his adjustment history. Plaintiff claims that DOC directives grant him the right to refuse the BMP. He seeks declaratory and injunctive relief, along with punitive and compensatory damages. *Id.*

---

[5] Plaintiff further alleges that the directives were adopted in violation of the Maryland Administrative Procedure Act ("APA"), which requires that regulations subject to amendment or modification must be subject to public notice and comment requirements. ECF No. 1.

[6] Plaintiff claims the one-hour weekly outdoor recreation in a "cage" with full restraints (leg irons, handcuffs, security box, and waist chain) allowed him limited mobility. ECF No. 1. He further asserted that restraints (handcuffs and leg irons) were tightly applied and cut into his wrists and ankles. *Id*. Plaintiff alleges that the limited amount of time out of his cell for recreation and showers put him at risk of physical and psychological deterioration. *Id*.

In response, Defendants assert that Plaintiff was transferred based upon a report that he was involved in trafficking Sunni Muslim information in an effort to retaliate against inmates who assaulted Muslim inmates in the MCI-H courtyard on June 14, 2007. ECF No. 16, Ex. A-2, ECF No. 34. Plaintiff was assigned to MCI-H administrative segregation pending case management team action because he was deemed a danger to the security of MCI-H, inmates, and/or staff and Plaintiff received notice that he had been assigned to administrative segregation because "reasons existed to believe that he posed a danger to the institution and/or inmates and/or staff." *Id*. He was advised that an investigation was ongoing. *Id.*

On July 25, 2007, MCI-H case management removed Plaintiff from administrative segregation, classified him to unassigned administrative segregation, and continued him on medium security "S" housing. ECF No. 16, Ex. A-2. Warden Rouse approved the recommendation and signed her approval on July 30, 2007. On August 2, 2007, Plaintiff was transferred to NBCI for placement into NBCI's behavioral management program, based on intelligence that Plaintiff was involved in security threat group activity and posed a threat to institutional security. *Id*., Ex. A-3. On August 7, 2007, Plaintiff underwent a case management review during which he had the opportunity to challenge the appropriateness of his administrative segregation assignment. *Id*,, Ex. A-3. At that time he was reassigned from "administrative segregation 120" to "administrative segregation," entered into the levels program and also placed on a transfer list. No explanation has been provided as to why Plaintiff's segregation status was changed, or what this designation meant.

On or about August 28, 2007, Plaintiff's placement on administrative segregation was again reviewed. He was continued on administrative segregation and removed from any transfer list. *Id*., Ex. A-4. Plaintiff received further case management reviews on September 25, 2007, October 23, 2007, November 20, 2007, December 8, 2007, January 15, 2008, February 12, 2008, March 11,

4

2008, April 8, 2008, and April 22, 2008. The BMP committee agreed to keep Plaintiff at the intake (ground) level due to his refusal to participate in the program.[7] *Id*., Ex.,5-13. He remained at the intake level until April 22, 2008, because he refused to attend or participate in the BMP meetings. *Id*. Defendants state, however, that in April of 2008, the BMP was made voluntary with persons opting not to participate in the program being removed from the intake level of the program and placed on administrative segregation.[8] Paper No. 16, Ex. 1, A-14, Ex. 2 at Holwager Decl. On April 9, 2008, Plaintiff signed an informed consent form, opting out of the BMP, and was reclassified to administrative segregation.[9] *Id*., Ex. 1, A-14, 15.

Defendants acknowledge that the program, initially implemented in January 2007, underwent many changes after several gang-related incidents of violence in DOC facilities and it was "difficult to discuss the behaviors that resulted in… placement in the program as many of the individuals were influential in security threat activity." ECF No. 16, Ex. 2 at p. 3. In addition, Defendants concede that the initial process for placement in the program was not clear, resulting in a number of individuals being placed at NBCI with little or no documentation to support the allegation that they were a threat to the security of the institution. Prior to being transferred to the SMU, a

---

[7] At the intake level of the BMP, inmates are permitted two showers per week, one day of recreation in three-piece restraints per week, and no visits except legal or clergy. ECF No. 16, Exs. 1 & 2. Inmates are required to stay at this level until they: (1) complete and turn in the program pre-test so as to move to Level 1; and (2) give a verbal commitment to participate in the program. *Id*. Levels 1 through 5 feature increased privileges and behavioral expectations. *Id.*, Ex. 2.

[8] Defendants insist that participants were never "forced" to participate in the program. They claim, however, that up until March or April of 2008, an inmate's refusal to participate meant that he remained at the intake level of the program until he elected to participate. ECF No. 16, Ex. 2; *see also* ECF No. 16, Ex. 5 (Case Management Manual, revised in February of 2008, dictates that an inmate who refused to participate in the BMP was to remain at the intake level indefinitely).

[9] Defendants maintain that an inmate assigned to administrative segregation is reviewed by case management personnel at least once every 30 days. If the inmate remains on administrative segregation for one continuous year, a report detailing the circumstances of his status is to be forwarded to DOC headquarters for review by the Commissioner or his designee. Paper No. 16, Ex. 2.

form for each inmate was supposed to be filled out by the sending institution and approved by the regional assistant commissioner and the assistant commissioner for programming. This approval process was not done for approximately 90 inmates who were transferred to the SMU at NBCI as "emergency" transfers. Once these inmates were housed at NBCI, they received a case-by-case review by NBCI staff. A "re-review" of all of the inmates was not completed until October of 2007. This resulted in 42 participants being discharged from the program because there was little, if any, documentation supporting their continued placement in the program. *Id*.

Inmates like Plaintiff who opted not to participate in the BMP were forced to remain at the initial intake level indefinitely and could not advance unless they decided to participate in the BMP. ECF No. 16, Ex. 2. Defendants admit that participation in the program was mandatory until April 2008, when the mandatory status was rescinded by the Assistant Commissioner of Correction. At that time if inmates in the SMU did not participate in the BMP, they were assigned to administrative segregation. The inmates were told they would remain in administrative segregation status until each convinced the Assistant Commissioner that he was no longer a threat to the security of the institution. They were further informed that the only manner upon which they could be removed would be to complete the BMP so as to establish they were not a threat. While on administrative segregation, inmates were reviewed by case management personnel at least once every 30 days and case managers were to consider available alternatives to continued administrative segregation. ECF No. 16, Exs. 1 and 5.

In his opposition, Plaintiff focuses on his claim that confinement on the SMU at NBCI constitutes an atypical and significant hardship giving rise to a liberty interest. ECF No. 22. He states that he should have been accorded a due process hearing and notification of the factual basis for the charges against him. Plaintiff complains that his stay in SMU was for an "indefinite" period

6

of time, limited only by Defendants' discretion and completion of the BMP.[10] He maintains that the SMU confinement constitute a typical and significant hardship under the cases of *Wilkerson v. Austin*, 545 U.S. 209 (2005) and *Farmer v. Kavanaugh*, 494 F.Supp.2d 345 (D. Md. 2007), because of the indefinite duration, extreme isolation and restrictions on the SMU, and his inability to earn diminution credits to shorten the length of his sentence. ECF No. 22. He claims that he is entitled to process that provides him fair notice of the factual reasons for his assignment, an opportunity to respond, and an administrative decision which provides him a short statement of the reasons for the decision. *Id*. Plaintiff argues that Defendants have failed to come forward with evidence justifying his placement on SMU and asserts that even though he remained assigned to administrative segregation from April of 2008, he no longer received monthly classification reviews to screen his custody status and to examine the reasonableness of continuing his confinement on administrative segregation. The Court notes that Plaintiff was released from DOC custody on May 26, 2010. ECF No. 35.

**Standard of Review**

Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

---

[10] Plaintiff asserted that as he remained housed on administrative segregation at NBCI until such time as he could demonstrate to administrators he was no longer a threat to the institution, other inmates or staff, the duration of his confinement was limited only by the discretion of the Commissioner and he could be held on administrative segregation for the remainder of his sentence. ECF No. 22.

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to....the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

**Analysis**

Mootness

Defendants assert that Plaintiff's complaint for injunctive relief is now moot because he was released from DOC custody on May 26, 2010. ECF No. 35.

" '[A] case is moot when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'" *United States v. Hardy,* 545 F.3d 280, 283 (4th Cir. 2008) (quoting *Powell v. McCormack,* 395 U.S. 486, 496 (1969)). " 'The inability of the federal judiciary to review moot cases derives from the requirement of Art. III of the Constitution under which the

exercise of judicial power depends upon the existence of a case or controversy.'" *Id.* (quoting *DeFunis v. Odegaard,* 416 U.S. 312, 316 (1974)).

Under 42 U.S.C. § 1983, an actual controversy must exist at all times while the case is pending. *See Steffel v. Thompson*, 415 U. S. 452, 459 n.10 (1974). It is possible for events subsequent to the filing of the complaint to make an injunctive relief request moot. *See Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991). This is so even though such a case presented a justiciable controversy at an earlier point in time and an intervening event rendered the controversy moot. *See Calderon v. Moore*, 518 U.S. 149, 150 (1996). Indeed, "[w]here on the face of the record it appears that the only concrete interest in the controversy has terminated, reasonable caution is needed to be sure that mooted litigation is not pressed forward, and unnecessary juridical pronouncements on even constitutional issues obtained…" *See Lewis v. Continental Bank* Corp, 494 U.S. 472, 480 (1990). To the extent that Plaintiff is seeking injunctive relief, the claim was mooted when he was released from DOC confinement. His claim for damages for the past wrongs alleged, however, is not moot, and will be analyzed below.

**Due Process Claims**

Administrative Segregation Assignment

In the prison context a liberty interest is created by the imposition of an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U. S. 472, 484 (1995). Following the reasoning of the Supreme Court in *Sandin*, the Court finds no liberty violation implicated in the decisions associated with Plaintiff's initial placement on administrative segregation at MCI-H, as it is not atypical for inmates to be placed on administrative segregation for any number of reasons. *See Hewitt v. Helms*, 459 U.S. 460, 468

(1983); *Beverati v. Smith*, 120 F.3d 500, 502 (4th Cir. 1997). Plaintiff was transferred to NBCI and remained on segregation. His classification level was not increased to maximum security until a recommendation for that level was approved based on intelligence reports that he was gathering information about staff and other inmates in an effort to lead a retaliatory strike on other prisoners. The Court finds there is nothing in the record which shows that the nature of Plaintiff's assignments to administrative segregation at MCI-H and NBCI comprised the atypical hardships contemplated by *Sandin* or *Beverati*. Therefore, they do not implicate a liberty interest. Further, Plaintiff's transfer to NBCI does not in and of itself implicate a liberty interest; he has no entitlement to notice and an opportunity to be heard prior to his transfer because as a prisoner he has no liberty interest in being housed in any particular prison facility. *See Olim v. Wakinekona*, 461 U.S. 238, 244-45 (1983); *Meachum v. Fano*, 427 U.S. 215, 224-25 (1976).

SMU Assignment

The restrictions which are the subject of Plaintiff's Complaint were imposed in August of 2007, when Plaintiff was assigned to the SMU at NBCI. This Court must determine if the conditions under which he was confined while in the SMU constituted an atypical and significant hardship.

There is no argument that the conditions at NBCI SMU at the intake level are extremely restrictive, controlled, monitored, and isolated. According to the record, Plaintiff remained so confined for approximately 237 days, from August 10, 2007 to April 8, 2008. Intake level inmates are housed alone, have no visits aside from attorneys or clergy, receive limited property privileges, and receive no commissary. The only time an intake level inmate may come out of his cell is to take a shower or to recreate once or twice a week. The physical contact between inmates and between inmates and officers is severely limited.

10

The Supreme Court examined the due process issue involving inmates confined at the Ohio State Penitentiary ("OSP"), a super-maximum security prison where almost all human contact was prohibited and communication between cells was forbidden, to determine whether a liberty interest was created in the isolated confinement and if so, what due process was to be afforded to the inmate so confined. *See Wilkinson v. Austin*, 545 U.S. 209 (2005). At the OSP, exercise was limited to one hour a day in a small indoor room and the inmates were exposed to light 24 hours per day. *Wilkinson* recognized that the deprivations detailed in that case exist in most solitary confinement facilities and looked at the presence of added factors to find "an atypical and significant hardship" on inmates such that they had a liberty interest in avoiding it.[11] *Id*., at 224. These factors were (1) the potentially indefinite length of detention, limited only by the length of the underlying sentence, and (2) being rendered ineligible for parole due to confinement. *Id*. The Supreme Court found that "while any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context," triggering a protected liberty interest in avoiding placement on such confinement. *Id*. In reviewing *Wilkinson*, it would appear that the Court instructed lower courts to consider the totality of circumstances in a given facility. *Id*.

Applying the Supreme Court's rationale in *Wilkinson*, this Court found that a transfer to the Maryland Correctional Adjustment Center ("MCAC"), a super-maximum security facility, implicated procedural due process protections, and concluded that:

> In light of the prohibition of "almost all human contact," coupled with severe

---

[11] While *Wilkinson* involved transfer to and housing in the isolated confinement of a "supermax" facility, it involved similar solitary confinement issues found here-- isolated human contact for potentially "indefinite" periods. Therefore, the Court finds *Wilkinson* instructive for due process analysis purposes.

restrictions on movement or any type of activity, both of which may last for the duration of some inmates' underlying sentences, and may be less likely to be relieved by parole than the less arduous conditions at other facilities, the conditions at MCAC create such a hardship when judged against "any plausible baseline." Inmates thus have a protected liberty interest in avoiding transfer to MCAC.

*Farmer v. Kavanaugh*, 494 F. Supp. 2d 345, 358 (D. Md. 2007).

Plaintiff describes the conditions imposed in the SMU as follows. All property was confiscated and privileges were revoked, with the exception of one weekly hour of fresh air, in full restraints. Two weekly showers were to be provided but could be revoked for minor offenses, such as talking or writing "kites" to other inmates, or covering cell lighting, which is on constantly. ECF Nos. 1 & 22. These restrictive conditions of intake level, together with the initial mandatory nature of the program, approach the type of conditions this Court has found to invoke a protected liberty interest.

At the time Plaintiff was assigned to the SMU, inmates were informed that they must participate in the BMP in order to earn their way out of the SMU and if they opted out of the program they remained at the most restrictive intake level until they chose to participate. Plaintiff states that confinement in the SMU was of an indefinite duration. The indefinite duration of the confinement was created by the mandatory nature of program participation.[12] When the "mandatory" requirement was removed, inmates who chose not to participate in the BMP were assigned to administrative segregation and told they would remain so assigned until the Assistant

---

[12] The difference between this case and *Farmer* is that the length of Plaintiff's stay on various SMU levels was in his own hands. The ability to move forward and to earn more privileges is based on the behavior of the inmate participants and does not rely solely on the discretion of a single decision-maker. In addition, the SMU policy requires regular reviews of the inmate participant's status. The record evidence shows that reviews were conducted in Plaintiff's case, albeit in a cursory manner due to his refusal to participate in the BMP.

Commissioner was convinced they were no longer a threat to the security of the institution. Inmates were told however, that the only way they could convince the assistant commissioner was to participate in the BMP. Even when participation in the BMP was deemed "voluntary," it was clear that participation was required if an inmate had any desire to return to general population. Thus, the assignment to administrative segregation for non-participants was indefinite.

At no point in his complaint does Plaintiff claim that his housing on SMU and his lack of participation in programming and institutional job assignments adversely effected his eligibility for parole. Any such claim lacks evidentiary support. First, unlike the *Wilkinson* inmates, Plaintiff's assignment to the SMU did not render him ineligible for parole for the duration of his stay. Second, Plaintiff's violent offense and immigration status are factors weighing against his suitability for parole. Thus, the undersigned does not find any assertion regarding parole eligibility persuasive; however, the indefinite duration of the restrictive conditions does give rise to a liberty interest entitling Plaintiff to due process protections arising at the time of assignment to the SMU.

The *Wilkinson* Court found that the process provided to Ohio inmates assigned to OSP complied with due process protections, noting that the Ohio inmates received written notice 48 hours in advance of a hearing "summarizing the conduct or offense triggering the review" and were provided a prepared form explaining why the review was initiated. *Wilkinson*, 545 U.S. at 216. The Ohio inmates were permitted to attend the hearing where they were allowed to offer "pertinent information, explanation and/or objections to OSP placement and may submit a written statement," but could not call witnesses. *Id*. In addition to the notice and hearing, the Ohio system included a

13

review of the committee's decision by the warden, who was to provide reasons for an approval of an assignment, as well as an additional review by a Bureau which was vested with final decision-making authority over all inmate assignments in Ohio. *Id*. After these reviews were completed, the inmate was allowed 15 days to file objections with the Bureau and only after this 15-day period expired was the inmate transferred to the facility. *Id*. at 217. Inmates who were transferred were given another review within 30 days of their arrival and, thereafter, were reviewed yearly. *Id*.

The three factors to be balanced to determine how much process is due are:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Wilkinson*, 545 U.S. at 224-225, *citing Matthews v. Eldridge*, 424 U.S. 319, 335 (1976).

Defendants were directed to file under seal all documentation concerning any investigation into Plaintiff's alleged threatening activity. Plaintiff has been provided the materials in redacted form. It is clear that correctional employees received information from inmate informants that Plaintiff was actively seeking information regarding staff and inmates in order to foment retaliation for an attack that had been carried out against Sunni Muslim inmates in June of 2007. While Plaintiff claims that he was never placed on notice of and was not given an opportunity to refute the allegations, his protest is belied by the record.

As a prisoner, Plaintiff is not entitled to the process due to persons who remain at liberty. "Prisoners held in lawful confinement have their liberty curtailed by definition, so the procedural

14

protections to which they are entitled are more limited than in cases where the right at stake is the right to be free from confinement at all." *Wilkinson*, 545 U.S. at 225. He is not entitled to an adversarial hearing, witnesses, evidence introduction, or other trappings of a full trial.

Plaintiff acknowledges that he was told he was being assigned to administrative segregation because he was believed to be a threat to the security of the institution. The exigencies present explain why notice was not provided before Plaintiff was assigned to administrative segregation. Expertise of prison officials in matters of security must be given its due deference. *See Sandin v. Conner*, 515 U.S. 472, 482 (1995). Defendants admit that a large number of the 90 inmates initially assigned to the SMU were assigned erroneously, but those inmates were processed out of the program when it was discovered there was no supporting documentation warranting their assignment. *See* ECF No. 16. Thus, there were safeguards in place to correct erroneous deprivations. Plaintiff's assignment was supported by documentation of his involvement in activities threatening to the security of the institution. *See* ECF No. 16 & 33

While the process provided to inmates at NBCI did not provide for as many levels of administrative review as provided to the inmates in *Wilkinson*, the reviews occurred monthly rather than annually. The undersigned finds that the process afforded to Plaintiff met with minimal constitutional standards.

**Equal Protection Claims**

"The Equal Protection Clause generally requires the government to treat similarly situated people alike." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). To show that his equal protection rights were violated Plaintiff must demonstrate that he was treated

15

differently than similarly situated inmates and the discrimination was intentional or purposeful. *See Williams v. Bitner*, 307 Fed. Appx. 609, 611 (3rd Cir. 2009). If the discrimination was based on Plaintiff's membership in a suspect class, the differential treatment must be narrowly tailored to a compelling interest; otherwise, Plaintiff must show that the discrimination did not bear a rationale relationship to a legitimate government purpose. *See Cleburne*, 473 U.S. at 440-42.

Viewing the facts and papers in a light most favorable to Plaintiff, he presents no genuine dispute whether the denial of his privileges violated equal protection. *Dennis v. Columbia Colleton Medical Center, Inc.*, 290 F.3d 639, 645 (4th Cir. 2002). Plaintiff has presented no evidence that his SMU and administrative segregation placements were based on a suspect classification. Rather, the evidence shows that he was so assigned because his gathering of information to incite retaliatory violence made him a security threat. ECF Nos. 16 & 33. The program was designed to "provide safety and security to the staff and inmates throughout the Division of Corrections" and to "reduce risky behavior." ECF No. 16, Ex. 3. This is a legitimate government purpose. *See Overton v. Bazzetta*, 539 U.S. 126, 133 (2003) ("internal [prison] security [is] perhaps the most legitimate of penological goals"). Curtailment of visitation, recreation, and property privileges, which emphasizes the connection between an inmate's "choices and consequences," is rationally related to providing a safer prison environment. ECF No. 16, Ex. 3; *see Overton*, 539 U.S. at 133. Defendants are entitled to summary judgment on Plaintiff's equal protection claim.

## Eighth Amendment Claim

To the extent Plaintiff alleges he was subjected to cruel and unusual punishment as a result of his confinement in the SMU, his claim fails. Routine discomfort is part of prison life. *See Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996), *citing Hudson v. McMillan*, 503 U.S. 1, 8-9 (1992).

16

"[T]o withstand summary judgment on an Eighth Amendment challenge to prison conditions a plaintiff must produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions." *Strickler v. Waters*, 989 F.2d 1375, 1381 (4th Cir. 1993). Notwithstanding the isolation Plaintiff suffered in the SMU and his allegations that he had limited fresh air activities causing him a bloody nose and the restraints used for out-of-cell activity cut his wrists and ankles (ECF No. 1), there is no evidence that he suffered serious or significant physical or emotional injury as a result of his confinement.[13] Defendants are therefore entitled to summary judgment on any Eighth Amendment claim.

## First Amendment

Plaintiff claims that the BMP seeks to "change the way plaintiff thinks and believes through psychological approaches and solitary conditions." ECF No. 1. He alleges that he made officials aware that he did not wish to participate in the BMP and as a result of his choice he remained in solitary confinement indefinitely.

The First Amendment protects "the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). An inmate, however, does not retain those First Amendment rights that are "inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S 817, 822 (1974). Thus, to show a violation of his First Amendment rights, an inmate must demonstrate that the restriction "serve[d] no

---

[13] In his opposition Plaintiff for the first time claims that while on the SMU he had no access to the law library and could "only order cases from Baltimore via satellite service but only if I know the exact citation." ECF No. 21. Whether offered as a ground under the Fourteenth Amendment as a due process or access-to-courts claim, Plaintiff has failed to allege a constitutional violation based upon this limited allegation.

legitimate penological goal and/or was not reasonably related to rehabilitation." *Folk v. Attorney General*, 425 F. Supp.2d 663, 673 (W. D. Pa. 2006).

The BMP was intended to "reduce risky behavior" of inmates "deemed to be a security threat to the good order of [the institution]," and to facilitate their "ultimate[]…return to a less restrictive environment." ECF No. 16, Ex. 3 at p. 4. Inmates were required to "give a verbal commitment to participate in the program" and to "demonstrate [r]espectful, appropriate behavior" to progress through the BMP levels. *Id*., Ex. 3 at p. 7. Plaintiff was placed in the BMP because he was deemed to be a threat to institutional security. ECF Nos. 16, 34, & 35.

Plaintiff raises no genuine issue about the program's penological goal of "reducing risky behavior" and improving institutional safety or its reasonable relationship to his rehabilitation. *See Folk*, 425 F.Supp.2d at 673-74 (dismissing inmate's First Amendment claim arising from required participation in rehabilitative programs). Defendants are entitled to summary judgment on Plaintiff's First Amendment claim.

## Conclusion

In light of the above analysis, Defendants' Supplemental Motion to Dismiss or for Summary Judgment, construed as a Supplemental Motion for Summary Judgment, shall be granted as to all claims. Plaintiff's Motion to Deny Defendant's Supplemental Response (ECF No. 38) shall be denied. A separate Order follows.

/s/
PETER J. MESSITTE
February 10, 2011　　　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE